UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
HAMMOND DIVISION

| | |
|---|---|
| JASMINE MOORE, as personal representative of the estate of JACOB D. MOORE, deceased,<br><br>Plaintiff,<br><br>v.<br><br>TOWN OF MERRILLVILLE, INDIANA, *et al.*,<br><br>Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)   No. 2:21 CV 317<br>)<br>)<br>)<br>)<br>) |

**OPINION and ORDER**

This matter is before the court on defendants' motion for partial summary judgment. (DE # 39.) For the reasons that follow, defendants' motion is granted.

**I.    BACKGROUND**[1]

On November 16, 2020, at around 5:48 AM, Merrillville police officers were dispatched to a storage facility, on a report of a male trespasser on the property. (DE # 40-1 at 15; DE # 40-12 at 1.) The trespasser turned out to be defendant Gregory Phillips. (DE # 40-12 at 1.) Defendant Officer Pavale Popovich and defendant Sergeant Barry Clanton were two of the officers who arrived on the scene. (DE ## 40-1 at 18; 40-2 at 13.) Shortly after the call for service was dispatched, another officer indicated over the radio that, if the trespasser was the same individual that the officer had interacted with on a

---

[1] The following facts are undisputed for purposes of defendants' motion, unless otherwise noted.

prior occasion, the individual had mental or emotional issues. (MPD radio traffic; DE # 40-2 at 13; DE # 40-1 at 23-25.)

Popovich arrived on the scene around 5:55 AM. (DE # 40-1 at 18.) He spoke with the person who called about the trespass, Johnathan DeWitt. (*Id.* at 18-19.) DeWitt told Popovich that he had previous experience with the trespasser, and told Popovich that the trespasser is "really manic, he's really out there." (*Id.* at 19; Popovich bodycam.)

While Popovich was speaking with DeWitt, Phillips stood on the floorboard of the driver side of his vehicle, with his head above the top of the vehicle, and began repeatedly honking his horn and waving the officers over. (DE # 40-1 at 19, 22.) Phillips told Popovich that he was trying to move his car. (*Id.* at 22.) When Popovich asked Phillips why he was honking his horn, Phillips got into the vehicle, with his rear driver side door and trunk still open, placed the car in drive and accelerated over the grass separating the storage facility from the street. (*Id.* at 22; Popovich bodycam.) He jumped the curb, nearly striking a vehicle. (DE # 40-1 at 40; Popovich bodycam.)

After Phillips drove off, several other officers on the scene immediately returned to their vehicles and left to follow Phillips. (Popovich bodycam; Meyers bodycam.) Clanton stayed on the scene to monitor things over the radio. (DE # 40-2 at 34-35.)

Popovich walked back to his car, and briefly answered a question DeWitt asked regarding carts that DeWitt wanted to retrieve. (Popovich bodycam; DE # 40-1 at 62-63.) Popovich's interaction with DeWitt lasted approximately 19 seconds, and approximately 36 seconds elapsed between Phillips' flight and Popovich entering his

vehicle, activating his lights and sirens, and leaving the scene to follow Phillips. (Popovich bodycam.)

Merrillville police officers attempted to conduct a traffic stop of Phillips' vehicle, but Phillips did not comply. (DE # 40-2 at 29-30; Meyer bodycam.) At this point, Popovich believed that Phillips had committed the criminal offenses of fleeing an investigatory stop, fleeing from a traffic stop, failing to yield to oncoming traffic, and allegedly trespassing. (DE # 40-1 at 42, 54, 113.)

During the pursuit, Popovich could not keep up with, and lost sight of Phillips' vehicle. (*Id.* at 48, 107.) Popovich traveled 90 miles per hour, in a 35 mile per hour speed zone. (*Id.* at 49.) Another officer in pursuit reached speeds of 110 miles per hour. (DE # 50-3; Meyer bodycam.) Popovich saw Phillips almost strike a second vehicle while Popovich pursued him. (DE # 40-1 at 58-60.)

At 5:59 AM, Clanton asked Popovich how fast he was traveling. (Popovich bodycam.) Popovich did not give the precise speed, but responded, "we're moving pretty good." (*Id.*) Clanton instructed him to terminate the pursuit, approximately one minute and forty five seconds after Popovich initiated it. (*Id.*) Popovich terminated pursuit and turned off his lights and sirens. (*Id.*)

While attempting to flee, Phillips lost control of his vehicle and hit the decedent, Jacob Moore,[2] killing him. (DE # 52 at 18.)

---

[2] The court will refer to Moore as the plaintiff without distinguishing between the victim and the estate representative unless the context otherwise requires.

Prior to engaging in this pursuit, Popovich had received training regarding how someone experiencing a mental crisis might react to police lights and sirens. (DE # 40-1 at 51.) He acknowledged that utilizing police lights and sirens could agitate a person in such a state. (*Id.*)

Popovich testified that he followed Phillips because he wanted to identify and speak with Phillips to determine the exact nature of the call for service by DeWitt. (*Id.* at 106.) Plaintiff cites evidence that Phillips' identity was, or could have been, available to Popovich, had he sought it. (DeWitt 911 call; DE # 40-1 at 15, 65-66; DE # 40-11.)

As a result of these events, plaintiff filed suit in the Lake Superior Court of Indiana against Phillips, the Town of Merrillville, Popovich, and Clanton. (DE # 5.) Popovich, Clanton, and the Town of Merrillville removed this action to federal court, on the basis of federal question jurisdiction under 28 U.S.C. § 1331. (DE # 1.)

Plaintiff's amended complaint alleges that Popovich and Clanton's actions violated Moore's due process rights under the Fourteenth Amendment. (*Id.* at 5.) Plaintiff alleges that the Town of Merrillville is liable for these due process violations, pursuant to *Monell v. Dep't of Soc. Servs. of the City of New York,* 436 U.S. 658 (1978), under a failure-to-train theory. (*Id.* at 7.) Plaintiff also alleges Indiana claims for wrongful death and negligence against all defendants. (*Id.* at 9-11.)

Popovich, Clanton, and the Town of Merrillville filed the present motion for partial summary judgment. (DE # 39.) The motion is fully briefed and is ripe for ruling.

4

## II. LEGAL STANDARD

Federal Rule of Civil Procedure 56 requires the entry of summary judgment, after adequate time for discovery, against a party "who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). In responding to a motion for summary judgment, the non-moving party must identify specific facts establishing that there is a genuine issue of fact for trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986); *Palmer v. Marion County*, 327 F.3d 588, 595 (7th Cir. 2003). In doing so, the non-moving party cannot rest on the pleadings alone, but must present fresh proof in support of its position. *Anderson*, 477 U.S. at 248; *Donovan v. City of Milwaukee*, 17 F.3d 944, 947 (7th Cir. 1994). A dispute about a material fact is genuine only "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248. If no reasonable jury could find for the non-moving party, then there is no "genuine" dispute. *Scott v. Harris*, 550 U.S. 372, 380 (2007).

The court's role in deciding a summary judgment motion is not to evaluate the truth of the matter, but instead to determine whether there is a genuine issue of triable fact. *Anderson*, 477 U.S. at 249-50; *Doe v. R.R. Donnelley & Sons Co.*, 42 F.3d 439, 443 (7th Cir. 1994). In viewing the facts presented on a motion for summary judgment, a court must construe all facts in a light most favorable to the non-moving party and draw all

5

legitimate inferences and resolve all doubts in favor of that party. *NLFC, Inc. v. Devcom Mid-Am., Inc.*, 45 F.3d 231, 234 (7th Cir. 1995).

## III. DISCUSSION

### A. Due Process Claims

Plaintiff alleges that Popovich and Clanton violated Moore's right to substantive due process by initiating and continuing an unnecessary pursuit of Phillips, resulting in Moore's death. (DE # 51 at 18.)

The crux of the parties' dispute on summary judgment is their disagreement as to the appropriate standard of review in this case. Defendants argue that, because this is a pursuit case, the intent-to-harm standard applies. (DE # 43 at 9.) Plaintiff, on the other hand, urges the court to find that this situation did not present an emergency, and therefore the deliberate indifference standard applies. (DE # 51 at 17-18.) In failing to address the intent-to-harm standard advocated by defendants, plaintiff appears to concede that the due process claims cannot survive summary judgment if the intent-to-harm standard is applied. Both parties base their argument on the Supreme Court's decision in *Cnty. of Sacramento v. Lewis*, 523 U.S. 833 (1998). Given the centrality of *Lewis* to the parties' dispute, an in-depth review of *Lewis* is in order.

In *Lewis*, an officer saw a motorcycle approaching at a high rate of speed. *Id.* at 836. The motorcycle driver was accompanied by a 16 year old passenger. *Id.* The officer turned on his rotating light, and attempted to pull the motorcycle over. *Id.* Instead of complying with the attempted traffic stop, the driver of the motorcycle sped off. *Id.* at

6

837. A second officer turned on his emergency lights and siren, and pursued the motorcycle through a residential neighborhood at a high rate of speed for 75 seconds. *Id.* The motorcycle and police car wove in and out of oncoming traffic, at speeds of up to 100 miles an hour, forcing other drivers to swerve off the road. *Id.* The officer followed the motorcycle at a distance of as little as 100 feet, when his car would have required 650 feet to stop. *Id.* The chase ended when the motorcycle tipped and the police car hit and killed the 16 year old passenger. *Id.* The parents and estate for the decedent filed suit, alleging that the officer violated the decedent's substantive due process right to life. *Id.* The Supreme Court granted certiorari to "resolve a conflict among the Circuits over the standard of culpability on the part of a law enforcement officer for violating substantive due process in a pursuit case." *Id.* at 839.

First, the *Lewis* Court emphasized that "the cognizable level of executive abuse of power [is] that which shocks the conscience." *Id.* at 846. "[T]he due process guarantee does not entail a body of constitutional law imposing liability whenever someone cloaked with state authority causes harm," and does not supplant traditional tort law. *Id.* at 848. "[T]he Constitution does not guarantee due care on the part of state officials; liability for negligently inflicted harm is categorically beneath the threshold of constitutional due process." *Id.* at 849. Thus, "conduct intended to injure in some way unjustifiable by any government interest is the sort of official action most likely to rise to the conscience-shocking level." *Id.* While deliberate indifference may be sufficient to shock the conscious in one environment, deliberate indifference may not be so patently

7

egregious in another environment. *Id.* at 850. "As the very term 'deliberate indifference' implies, the standard is sensibly employed only when actual deliberation is practical," such as in the context of daily prison operations. *Id.* at 851. However, a much higher standard of fault is required for constitutional liability in situations, such as a prison riot, where officials must act quickly in the face of competing obligations. *Id.* at 853.

The Supreme Court found that police officers in pursuit, like officers facing a prison riot, must act quickly under pressure, and be decisive while at the same time showing restraint. *Id.* "A police officer deciding whether to give chase must balance on one hand the need to stop a suspect and show that flight from the law is no way to freedom, and, on the other, the high-speed threat to all those within stopping range[.]" *Id.* The Court distinguished the situation of a pursuit from that of the ordinary prison context, where officials have "time to make unhurried judgments, upon the chance for repeated reflection, largely uncomplicated by the pulls of competing obligations." *Id.* Therefore, unlike in the ordinary prison context, where deliberate indifference shocks the conscious, in the case of police pursuit even "precipitate recklessness" fails to shock the conscious. *Id.* Accordingly, the Supreme Court held that "high-speed chases with no intent to harm suspects physically or to worsen their legal plight do not give rise to liability under the Fourteenth Amendment[.]" *Id.* at 854.

Applying this standard to the case before it, the Supreme Court held that the officer did nothing to cause the motorcycle driver's lawless behavior, and nothing beyond refusing to call of the chase, to encourage the driver to race through traffic. *Id.*

8

at 855. While it may not have been prudent to initiate pursuit, prudence "was subject to countervailing enforcement considerations," and there is no reason to believe that the officer was motivated by malice. *Id.* Thus, "[r]egardless whether [the officer's] behavior offended the reasonableness held up by tort law or the balance struck in law enforcement's own codes of sound practice, it does not shock the conscience[.]" *Id.*

Plaintiff's claim that a deliberate indifference standard applies in this case is based on the Supreme Court's reasoning in *Lewis* that when actual deliberation is practical, the deliberate indifference standard applies. (DE # 51 at 19; *Lewis*, 523 U.S. at 853.) Plaintiff cites the 36 seconds it took Popovich to follow Phillips after Phillips fled the scene, including Popovich's brief interaction with DeWitt, to argue that Popovich had time for actual deliberation prior to initiating the pursuit, and thus it was not the type of emergency situation for which the intent-to-harm standard applies. (DE # 51 at 7.) Plaintiff's argument ignores the Supreme Court's analogy between police pursuits and the prison context in the Court's discussion of when "actual deliberation is practical." *See Lewis*, 523 U.S. at 851. The police pursuit in this case is plainly much more analogous to the context of a prison riot in terms of its rapidly-evolving nature, than to the context of day-to-day prison operations, in which unhurried deliberation is practical.

Furthermore, neither the Supreme Court nor the Seventh Circuit parse pursuit cases in the manner plaintiff advocates. The Supreme Court's holding in *Lewis* applied broadly to pursuit cases. *See Lewis*, 523 U.S. at 854 ("[W]e hold that high-speed chases

9

with no intent to harm suspects physically or to worsen their legal plight do not give rise to liability under the Fourteenth Amendment[.]"). Subsequent Seventh Circuit cases have applied *Lewis* in this same broad manner, as the Seventh Circuit's holding in *Steen v. Myers*, 486 F.3d 1017 (7th Cir. 2007), illustrates.[3]

In *Steen*, a police officer observed a motorcycle driver with whom the officer had previously had a negative interaction. *Id.* at 1019. The officer suspected that the motorcycle driver's license was suspended and the driver did not possess a valid motorcycle endorsement. *Id.* The officer drove past the motorcycle driver and parked the patrol car to check the status of the motorcycle driver's license. *Id.* The officer periodically drove past the motorcycle driver, while he waited for confirmation about the driver's license. *Id.* When he received confirmation of his suspicions, the officer went back to find the motorcycle driver. *Id.* When the driver saw the officer he sped away. *Id.* The officer attempted to complete a traffic stop, but the driver did not pull over. *Id.* The officer then gave chase at speeds between 100 and 130 miles per hour, until, six minutes later, the chase ended when the motorcycle left the road, killing the driver and injuring his passenger. *Id.*

The Seventh Circuit applied the intent-to-harm standard to the case. *Id.* at 1024. The Court held that "even a minor traffic stop, and pursuit of a fleeing suspect after an

---

[3] *Cf. Bublitz v. Cottey*, 327 F.3d 485, 491 (7th Cir. 2003) (where officer had three to five minutes to decide whether to use police tactic that resulted in bystanders' deaths, court declined to decide between intent-to-harm and deliberate indifference standards because facts could not meet either standard, "even assuming [the two standards] presented different inquires").

unexplained flight from that stop, is a legitimate government interest." *Id.* at 1023. The Court rejected the plaintiffs' argument that the officer could have stopped the chase and tracked down the driver the next day, holding: "this is an argument that goes to the question of whether the pursuit was wise, not whether it violated the Constitution." *Id.* The Court likewise rejected the argument that internal police policy indicated that the officer should have stopped the pursuit, as this argument "does not raise questions that implicate the Constitution." *Id.* The plaintiffs' claimed that the officer had played a "cat-and-mouse" game with the driver immediately preceding the chase, and that a reasonable jury could infer an improper motive on the part of the officer in light of the officer's prior negative interaction with the driver. *Id.* at 1022-23. The Seventh Circuit ultimately found that none of the evidence, even taken in the light most favorable to the plaintiffs, was sufficient to infer that the officer possessed the intent to harm the driver. *Id.* at 1024.

As the Seventh Circuit's decision in *Steen* demonstrates, our appellate court does not scrutinize an officer's actions down to the second to determine whether a pursuit was the type of emergency in which the intent-to-harm standard applies. Rather, the appellate court broadly applies the standard where there was a pursuit. *See also Schaefer v. Goch*, 153 F.3d 793, 798 (7th Cir. 1998) ("The *sine qua non* of liability in cases analogous to high-speed chases . . . is 'a purpose to cause harm.' " (quoting *Lewis*, 523 U.S. at 836)). The fact that it took Popovich 36 seconds to join the pursuit does not mean that the situation qualified as a non-emergency where actual deliberation was practical. *See also*

11

*Carter v. Simpson*, 328 F.3d 948, 952 (7th Cir. 2003) (officer speeding to respond to reported death was responding to "emergency" – rather than situation where actual deliberation was possible – thus, intent-in-harm standard applied).

Relatedly, plaintiff cites *Flores v. City of S. Bend*, 997 F.3d 725 (7th Cir. 2021), to argue that the Seventh Circuit scrutinizes whether an emergency justifies the risk to the public when an officer commences "high-speed driving."[4] (DE # 51 at 17.) In *Flores*, a police officer sped through a red light at up to 98 miles per hour to reach a routine traffic stop he was not invited to aid, crashing into the decedent's car and killing her. *Flores*, 997 F.3d at 728. There was no pursuit of the driver, and no assistance requested from the officers conducting the traffic stop. *Id*. The Seventh Circuit, distinguishing the case before it from a situation in which an officer gives chase, found that the officer was not responding to an emergency and therefore the deliberate indifference standard applied. *Id.* at 729-30. As Moore's case *does* involve an officer giving chase, *Flores* is plainly not applicable.

Similarly, the holdings in *Lewis* and *Steen* also foreclose plaintiff's argument that Popovich's high-speed pursuit was unjustified by the circumstances. (DE # 51 at 19.) As in this case, both *Lewis* and *Steen* involved pursuits for low-level offenses, at speeds in excess of 100 miles per hour. Yet, in both *Lewis* and *Steen*, the recklessness of the chase was insufficient to establish liability, and the necessity of the pursuit was irrelevant.

---

[4] Plaintiff's careful phrasing here is the first indication that *Flores* is not applicable, as *Flores* does not involve police pursuit.

Plaintiff also makes several arguments that Popovich and Clanton acted contrary to internal police policy. (DE # 51 at 20.) However, the courts in both *Lewis* and *Steen* rejected arguments that internal police policy is relevant to the question of whether a defendant's actions violated the constitution.

As the foregoing analysis demonstrates, the appropriate standard here is intent-to-harm. There is simply no evidence that defendants possessed an intent-to-harm, and by failing to even argue to the contrary, plaintiff appears to concede the issue.

This court, however, is mindful of the Seventh Circuit's caution against reading the classifications between deliberate indifference and intent-to-harm too rigidly; instructing courts to ultimately focus on the more general inquiry of whether the government conduct at issue shocks the conscious. *Bublitz*, 327 F.3d at 490 (citing *Schaefer*, 153 F.3d at 797). In light of the applicable authority, even taking all facts and reasonable inferences in the light most favorable to plaintiff, no reasonable jury could determine that defendants' conduct shocks the conscious. Defendants were faced with an individual, apparently in some mental distress, who was allegedly trespassing. When he was approached, he fled both the investigatory stop and traffic stop, committing numerous traffic violations along the way. Under these circumstances, defendants' decision to engage in a two-minute, high-speed pursuit does not shock the conscious.

Plaintiff's final argument is that summary judgment is inappropriate because resolving whether Popovich acted with the requisite intent is a matter to be left to the

13

jury. (DE # 51 at 19-20.) This argument is inconsistent with the authority cited in this opinion, wherein the Supreme Court and Seventh Circuit found that summary judgment was warranted because there was insufficient evidence of the requisite intent. *Steen*, in particular, lays waste to plaintiff's claim that the question of intent must be submitted to a jury. *See Steen*, 486 F.3d at 1024 (evidence of intent-to-harm insufficient to create question of fact for jury, despite claims that officer acted with nefarious intent based on prior negative interaction with suspect, and evidence that officer engaged in "cat-and-mouse" game with suspect immediately prior to pursuit). The evidence here is similarly lacking.

It is tragic that Moore, an innocent bystander, was killed during this police pursuit. However, plaintiff has not provided facts that can reasonably lead to the conclusion that defendants' conduct precipitating Moore's death shocks the conscious. Accordingly, Popovich and Clanton are entitled to summary judgment with regard to plaintiff's due process claims.

    B.    Monell *Claims*

In light of this court's finding that there was no constitutional injury, the Town of Merrillville is entitled to summary judgment on plaintiff's *Monell* claim. *See Sallenger v. City of Springfield, Ill.*, 630 F.3d 499, 504 (7th Cir. 2010) ("[A] municipality cannot be liable under *Monell* when there is no underlying constitutional violation by a municipal employee."); *Jenkins v. Bartlett*, 487 F.3d 482, 492 (7th Cir. 2007) ("[T]here can be no

liability under *Monell* for failure to train when there has been no violation of the plaintiff's constitutional rights.").

    C.    *State Law Claims*

Plaintiff's state law claims are all that will survive defendants' motion for summary judgment. Principles of comity encourage the court to relinquish supplemental jurisdiction over state law claims when all of the federal claims are disposed of prior to trial. *See Hansen v. Bd. of Trs. of Hamilton Southeastern Sch. Corp.*, 551 F.3d 599, 608 (7th Cir. 2008); *Groce v. Eli Lilly & Co.*, 193 F.3d 496, 501 (7th Cir. 1999); 28 U.S.C. § 1367(c)(3). In fact, in this circuit, there is a "presumption" that federal courts will relinquish jurisdiction over supplemental state law claims when the federal claims drop out of the case. *RWJ Mgmt. Co., Inc. v. BP Prods. N. Am., Inc.*, 672 F.3d 476, 478 (7th Cir. 2012). "The presumption is rebuttable, but it should not be lightly abandoned, as it is based on a legitimate and substantial concern with minimizing federal intrusion into areas of purely state law." *Id.* at 479 (internal citation and quotation marks omitted).

The Seventh Circuit has identified three situations where a district court should retain jurisdiction over a supplemental claim even though all federal claims have dropped out: "where the statute of limitations would bar the refiling of the supplemental claims in state court . . . ; where substantial federal judicial resources have already been expended on the resolution of the supplemental claims; and where it is obvious how the claims should be decided." *Williams Elecs. Games, Inc. v. Garrity*, 479 F.3d 904, 906–07 (7th Cir. 2007). None of those circumstances are present in this case.

15

This suit was originally filed in state court, and was removed, so the statute of limitations is not an issue. Additionally, the court has not spent substantial resources on the resolution of the state claims.

Finally, it is not obvious how the state law claims should be resolved. Defendants have not moved for summary judgment on the state claims, apparently conceding that genuine issues of material fact preclude the entry of summary judgment on those claims. Therefore, the court will decline to exercise supplemental jurisdiction over plaintiff's state law claims, and this case will be remanded to state court.

## IV.   CONCLUSION

For the foregoing reasons, the court **GRANTS** defendants' motion for partial summary judgment. (DE # 39.) Plaintiff's motion for leave to file a sur-reply is **GRANTED** to the extent that the sur-reply was accepted by the court, and **DENIED** in so far as plaintiff seeks attorneys fees. (DE # 57.) The court **DECLINES** to exercise supplemental jurisdiction over plaintiff's remaining state law claims. Plaintiff's remaining claims are **REMANDED** to state court. The Clerk is directed to return the case to the state court from which it originated.

**SO ORDERED.**

Date: August 11, 2023

 s/James T. Moody
JUDGE JAMES T. MOODY
UNITED STATES DISTRICT COURT